## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

AF HOLDINGS, LLC,

      Plaintiff/Counterdefendant,

v.

SANDIPAN CHOWDHURY,

      Defendant/Counterplaintiff.

Civil Action No. 1:12-cv-12105-IT

### MEMORANDUM IN SUPPORT OF MOTION FOR JOINDER/SUBSTITUTION OF PARTIES PURSUANT TO Fed.R.Civ.P. 25(c) AND ENTRY OF AN AMENDED JUDGMENT

      The Court entered an uncontested $64,180.80 default judgment against Counterdefendant AF Holdings, LLC ("AF"). Doc. 31. The Court re-entered the judgment against attorneys John Steele ("Steele"), Paul Hansmeier ("Hansmeier") and Paul Duffy ("Duffy")[1]—collectively, "Principals"—jointly and severally with AF and their law firm Prenda Law ("Prenda"), and denied their motions to vacate that judgment. *See* Doc. 34; and Doc. 43. Prior to re-entry of the judgment, other courts had found that "AF is an empty shell created by Steele and Hansmeier," who used AF as an alter-ego. Doc. 30-1, at *34 (see *Exhibit A*). Yet the First Circuit vacated the re-entered judgment because the attorneys were not personally served or named as parties; even an indisputable alter-ego relationship with AF "that would permit both serving them and holding them liable on the judgment does not obviate the need to call them before the court before entering judgment." *See* Doc. 76, at 2. To satisfy the Order on Remand to "file a proposed Amended Judgment," [Doc. 78], Counterplaintiff Sandipan Chowdhury ("Chowdhury") moves to add or substitute Steele and Hansmeier as counterdefendants pursuant to Rule 25(c) so they may be held liable for damages they caused him through their alter-egos. In support, Chowdhury states as follows.

### FACTUAL AND PROCEDURAL HISTORY

1.  AF filed suit alleging copyright infringement against Chowdhury on November 13, 2012. Doc. 1. AF's counsel, Prenda, posted the complaint on its website accusing Chowdhury of criminal acts including infringement. Doc. 12-2. Prenda retained Daniel Ruggiero ("Ruggiero") as local counsel. Doc. 42-2, at 1 ¶ 2.

---

[1] Duffy passed away on August 10, 2015.

2. The Principals had formed AF in order to conduct their campaign to sue and coerce settlements through Prenda. *Exhibit A, at \*32–33; Doc. 15-1, at \*6 (see Exhibit B).*

3. Chowdhury answered, denying any liability, and raising counterclaims. Doc. 7, at 14–20 ¶¶ 16–59. The counterclaims alleged, *inter alia,* "Plaintiff is represented by Prenda Law, Inc. (f/k/a Steele Hansmeier PLLC)." *Id.*, at 12 ¶ 7. "Plaintiff and its counsel appear to be engaged in widespread fraud." *Id.*, at 13 ¶ 12. "Plaintiff may not even exist; and Plaintiff's counsel may truly be the real parties in interest in this case." *Id.*, at 14 ¶ 15.

4. On January 30, 2013, Chowdhury moved for an order requiring AF to post a $60,000 bond to secure any potential recovery. Doc. 11. His supporting memorandum described AF as "the offshore, and perhaps non-existent, litigation machine that brings suit." Doc. 12, at 1. He explained that AF "may in fact be an alias of its counsel, Prenda Law" and that "AF's counsel [are] potentially the real party in interest here." *Id.*, at 1, 16. *See also* Doc. 22-1 (see *Exhibit C*). Chowdhury further outlined "the many faces of Prenda Law," describing the corporate structures behind the Principals' copyright litigation business model. Doc. 12-3.

5. On May 6, 2013, the court in *Ingenuity 13 LLC v. Doe*, No. 12-cv-8333 (C.D. Cal. 20120) (hereinafter "*Ingenuity 13*"), determined the Principals to be alter-egos of Prenda and AF and, therefore, the real parties in interest. This alter-ego relationship was material to finding the Principals jointly and severally liable for the acts of one another, Prenda, AF, and Ingenuity 13. *Exhibit B; Exhibit A,* at \*30–35. On May 8, 2013, Chowdhury requested that the Court take judicial notice of the *Ingenuity 13* sanctions order. Doc. 15.

6. AF failed to appear at a June 17, 2013 motion hearing. Doc. 16; Doc. 17. Instead, AF's local counsel, Ruggiero, emailed the clerk of Court, "I have no objection to the motion for bond. I will be filing a motion to dismiss plaintiffs claims against defendant shortly as well as a motion to withdraw." Doc. 18. On June 19, 2013, the Court denied AF's motions to dismiss and to strike the counterclaims, allowed Chowdhury's motion to require AF to post a $60,000 bond for costs, and construed Ruggiero's June 17, 2013 email as a motion to dismiss AF's claims, which the Court allowed. Doc. 20. On July 10, 2013, Chowdhury requested an entry of default when AF failed to answer the counterclaims. Doc. 21. AF did not oppose.

7. Prenda was dissolved in July 2013. *See* Doc. 42-10, at 9 n. 17. Prenda was "a mere continuation of Steele Hansmeier [PLLC]," also dissolved, in which Steele and Hansmeier had been partners. *Exhibit A,* at \*9. *See also* Doc. 12*,* at 13; Doc. 42-16, at 6.

8.  On August 13, 2013, Chowdhury's counsel informed Ruggiero that, having moved for default, Chowdhury planned to file for civil contempt for AF's failure to post bond as ordered. Doc. 42-1. Ruggiero replied, "I have made them aware of everything. They also get all of the pleadings etc automatically and I can vouch for you on that." *Id.* Chowdhury's counsel told Duffy about both the default and his plan to file for civil contempt. Doc. 42-3. Duffy then threatened Ruggiero, "Please call me before our client sues you for malpractice." Doc. 42-6; Doc. 42-2, at 2 ¶ 13.

9.  On August 14, 2013, Ruggiero moved to withdraw as AF's counsel of record without substitution, citing "things that have come to light regarding Plaintiff and its related owners, officers and lawyers." Doc. 22, at 1 ¶ 1. He said it was "impossible … to file pleadings on behalf of the Defendant [sic] when there is no reasonable basis to conclude that anything Plaintiff tells counsel is truthful." *Id.*, at 4. In support, Ruggiero requested that the Court read the *Ingenuity 13* order [*Exhibit B*] and an order [see *Exhibit D*] in *AF Holdings LLC v. Navasca*, No. 12-cv-2396 (N.D. Cal. 2012) (hereinafter "*Navasca*"). *Id.*, at 1 ¶ 2.

10. Ruggiero's motion was allowed on August 20, 2013. Doc. 23. The Court mailed copies of the order and the docket sheet to AF's last known address. Doc. 24. No substitute counsel ever appeared and AF proceeded *pro se*.

11. AF was defaulted on August 29, 2013. Doc. 25; Doc. 26. Chowdhury moved for default judgment against AF on September 13, 2013. Doc. 28. He sought as damages $21,393.60 incurred in attorney's fees, trebled to $64,180.80 pursuant to Mass. Gen. L. c. 93A. *See* Doc. 7, at 18–20 ¶¶ 49–59; Doc. 29, at 6–7. The default motion defined AF as "an alias of Prenda Law, Inc. and its principals—John Steele, Paul Duffy and Paul Hansmeier," [Doc. 29, at 1], and as "a straw plaintiff," [*id.*, at 2]. Chowdhury also filed a supporting affidavit of counsel pursuant to Fed. R. Civ. P. 55(b)(2), itemizing and attesting to the fees incurred. Doc. 29-2. Chowdhury's counsel emailed the motion for default judgment and memorandum of law to Duffy. Doc. 42-8. Duffy replied, "I am not counsel in this case. … I decline to accept service by email." *Id. Cf.* Doc. 29-1 (Duffy identifying himself as national counsel for AF). Duffy further stated "I have placed you in my "spam" filter." *Id.*

12. Chowdhury's counsel also sent copies of the motion and memorandum to the Principals via certified mail; return receipts confirmed delivery to each. Doc. 42-9. No opposition was filed.

13. On September 16, 2013, the *Navasca* court adopted as preclusive the *Ingenuity 13* findings about the relationship between AF and the Principals. *Exhibit A*, at *18–24.

14. Having found that "AF is an empty shell created by Steele and Hansmeier," the *Navasca* magistrate recommended adding them as debtors to the judgment against AF. *Id.*, at \*34–35. The *Navasca* court found the magistrate judge's "disposition of the motion for sanctions was proper" and adopted the Report and Recommendation that Steele and Hansmeier could be held personally liable for the acts of AF Holdings on *de novo* review. *Exhibit C*, at \*3. On September 23, 2013, Chowdhury requested the Court take judicial notice of the *Navasca* order. Doc. 30.

15. On September 30, 2013, Chowdhury's motion for default judgment against AF was "allowed without opposition." Doc. 31. AF did not contest or appeal from the judgment. On October 17, 2013, Chowdhury moved for entry of final judgment jointly and severally against AF "and its aliases," including the Principals. Doc. 32. The Court allowed the motion and re-entered judgment in that form on October 22, 2013. Doc. 33; Doc. 34. The next day, the Court mailed copies of the order and the final judgment to AF's last known address. Doc. 35. The mailing was returned as undeliverable on November 13, 2013. Doc. 40.

16. The Principals moved to vacate the judgment, arguing that they had not been separately named as parties and served. Doc. 36; Doc. 38; Doc. 41. Chowdhury opposed, arguing that the judgment was not mistaken, fraudulent, or void, and that setting it aside would be futile. Doc. 42. He further detailed the Principals' notice of the filings in this case that identified them as the real parties in interest. *Id.*, at 10–13. *See also* Doc. 69-2, at \*7–14, 16 (attached as *Exhibit E*).

17. On December 3, 2013, the Court denied their motions to vacate, judgment, reasoning:

> Steele and Hansmeier's motions fail to demonstrate that the removal of the default judgment would not be an empty exercise. Regardless of the exact relationship between Steele and Hansmeier, on the one hand, and Plaintiff, on the other, it is clear that Steele and Hansmeier had notice of all filings in this case, including filings that identified Steele and Hansmeier as the controlling owners of Plaintiff. Steele and Hansmeier therefore had ample opportunity to litigate this case before default was entered.

Doc. 43. In footnotes, the Court referenced the *Ingenuity 13* sanctions order, and yet another AF case in which yet another court recognized the Principals' and AF's tangled relationship:

> This court is not the first federal court to decline to unravel this relationship. … "The Court further concludes that, once all of the ill-gotten gains are fully disgorged from AF Holdings, it would not be a wise use of the Court's limited resources to *sua sponte* attempt to fully untangle the relationship between Hansmeier, Steele, Duffy, Dugas, Lutz and Prenda Law, on the one hand—and the Plaintiff, AF Holdings, LLC., on the other."

*Id.*, at 2 n. 5 (citation omitted).

18. The Principals filed a joint notice of appeal on December 16, 2013. Doc. 45.

19. On July 13, 2015, Hansmeier filed for bankruptcy. *In re Hansmeier*, No. 15-bk-42460, ECF No. 1 (Bankr. D. Minn. 2015). The bankruptcy triggered the automatic stay pursuant to 11 U.S.C. § 362 which prevented further judicial proceedings in this matter pending resolution in the bankruptcy.

20. The Ninth Circuit affirmed the *Ingenuity 13* sanctions order on June 10, 2016. *Ingenuity 13 LLC v. Doe,* 651 Fed. App'x. 716 (9th Cir. 2016) (see *Exhibit F*) (provided to the First Circuit under Rule 28(j) on June 10, 2016).

21. The First Circuit vacated and remanded this Court's judgment against the Principals on August 4, 2016. Doc. 76. The First Circuit's mandate was entered on August 29, 2016. Doc. 77. The judgment against AF and Prenda still stands. Doc. 78.

22. On September 8, 2016, the Court vacated the order denying the Principals' motions to vacate, granted those motions, and set aside the judgment against them, ordering Chowdhury to file an amended judgment. Doc. 79.

23. On remand, Chowdhury moved to add or substitute Steele and Hansmeier as counterdefendants pursuant to Rule 25(c). Doc. 81. Chowdhury's motion was denied without prejudice and with the instruction that any renewed motion to substitute must first be served upon Steele and Hansmeier in accordance with LR. D. Mass. 4.1 and Rule 4 of the Federal Rules of Civil Procedure, before the motion could be filed with the Court. Doc. 92. However, the automatic stay imposed by Hansmeier's bankruptcy prevented further attempts by Chowdhury to serve Steele and Hansmeier with a renewed motion. 11 U.S.C. § 362.

24. On January 3, 2018, the Bankruptcy Court approved the waiver of discharge submitted by Hansmeier. *In re Hansmeier*, ECF No. 262 (Jan. 3, 2018). By virtue of Hansmeier's waiver, the automatic stay was terminated [11 U.S.C. § 362(c)(2)(C)] and Chowdhury was able to proceed with service of the renewed motion to substitute upon Steele and Hansmeier. Doc. 120.

## LEGAL STANDARD

The First Circuit has "sanctioned the use of Rule 25(c) to join parties as alter-egos and hold them liable for the full judgment." *Rodríguez-Miranda v. Benin*, 829 F.3d 29, 43 (1st Cir. 2016). Federal Rule of Civil Procedure 25 governs substitution of parties and provides:

> If an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action

or joined with the original party. The motion must be served as provided in Rule 25(a)(3).

Fed. R. Civ. P. 25(c).

Rule 25(c) "is a discretionary 'procedural vehicle' in which 'the transferee is brought into court solely because it has come to own the property in issue.'" *Negrón-Almeda v. Santiago*, 579 F.3d 45, 53 (1st Cir. 2009) (*quoting Maysonet-Robles v. Cabrero*, 323 F.3d 43, 49 (1st Cir. 2003)). "The merits of the case and the disposition of the property are still determined vis-a-vis the originally named parties.'" *Id.* (*quoting Minn. Mining & Mfg. Co. v. Eco Chem, Inc.*, 757 F.2d 1256, 1263 (Fed. Cir. 1985)). A "substitution decision is within the discretion of the district court." *Explosives Corp. of Am. v. Garlam Enters. Corp.*, 817 F.2d 894, 904 (1st Cir. 1987). Only "a factual dispute that the court is compelled to view as genuine" requires a trial or evidentiary hearing before substitution under Rule 25(c). *Arnold Graphics Indus., Inc. v. Indep. Agent Ctr., Inc.*, 775 F.2d 38, 43 (2d Cir. 1985); *Beane v. Beane*, 2011 U.S. Dist. LEXIS 8872, *8 (D.N.H. 2011) ("In the absence of a genuine factual dispute … [t]he court can therefore rule on [a] motion to substitute by looking to materials beyond the pleadings, and without conducting an evidentiary hearing.") (citation omitted); "If … there is no genuine factual issue, the formality of a hearing serves no purpose." 6 James Wm. Moore et al., *Moore's Federal Practice* § 25.35[3], at 56 (3d ed. 2007).

## ARGUMENT

On August 4, 2016, the clerk to the First Circuit entered an order vacating and remanding this Court's judgment against the Principals. Doc. 76. The order addressed neither the facts nor the prior precedent provided. Rather, the order relied primarily on *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 110 (1969) for the proposition that a party cannot be bound by a foreign judgment when that party was not designated as a party in that suit. Doc. 76, at 2. Moving forward, Chowdhury wants to be clear that he agrees with the principle that the "consistent constitutional rule has been that a court has no power to adjudicate a personal claim or obligation unless it has jurisdiction over the person of the defendant." *Zenith,* 395 U.S. at 110 (*citing Pennoyer v. Neff*, 95 U.S. 714 (1878)). However, the facts in *Zenith* are distinguishable.

In *Zenith*, a subsidiary stipulated that the subsidiary and its parent should be treated as one entity for purposes of discovery, despite the parent not being a party to the action, and the district court subsequently entered a judgment against the subsidiary and its parent. *Zenith,* 395 U.S. at 109–10. The Supreme Court reversed, holding that a parent company cannot be held liable for a

previously rendered judgment against its subsidiary when the district court did not have jurisdiction over the parent. *Id.*, at 111. However, the parent company never had the opportunity to contest the issue of piercing the corporate veil; a fact that was significant to the Supreme Court's holding. *Id.* ("[The subsidiary] may have executed the stipulation to avoid litigating the alter-ego issue, but this fact cannot foreclose [the parent], which has never had its day in court on the question of whether it and its subsidiary should be considered the same entity for purposes of this litigation.").

In contrast to the facts in *Zenith*, Steele and Hansmeier have already had a full and fair opportunity to litigate the issue of their alter-ego liability in *Ingenuity 13*. Therein, the Principals invoked the Fifth Amendment, and the court drew adverse inferences from their refusal to testify. *Exhibit B*, at \*5 n. 3 (*citing Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)). The *Ingenuity 13* court conclusively determined that the Principals used AF as an alter-ego and controlled its litigation. *Exhibit B*. This alter-ego relationship was material to finding the Principals jointly and severally liable for the acts of one another, Prenda, AF, and Ingenuity 13. *Exhibit B*, \*15.

Nor is this a situation in which there could be any due process constraints on the exercise of jurisdiction. A plaintiff who commences an action in a state that would not otherwise be able to obtain jurisdiction over the plaintiff's person consents to jurisdiction there for any counterclaim. *Henry v. Sheffield*, 749 F. Supp. 2d 3, 14 (1st Cir. 2010) (*citing Adam v. Saenger*, 303 U.S. 59, 67–68 (1938)). AF is little but Steele and Hansmeier by another name; a sham entity they created for the sole purpose of perpetrating fraudulent copyright lawsuits. *Exhibit B*, at \*6. "[A] court which has jurisdiction over a corporation has jurisdiction over its alter-egos." *Minn. Mining & Mfg. Co.*, 757 F. 2d at 1265. *See also Int'l Envtl. Mgmt., Inc. v. Envirotron, Inc.*, 724 F. Supp. 2d 230, 237–38 (D. Mass. 2010). In this situation the two are considered the same person, and the jurisdictional contacts of one are attributed to the other for purposes of the due process analysis. *See e.g.* Doc. 42, at 10–13.

> [F]ederal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter-ego or successor of a corporation that would be subject to personal jurisdiction in that court … The theory underlying these cases is that, because the two corporations (or the corporation and its individual alter-ego) are the *same entity*, the jurisdictional contacts of one are the jurisdictional contacts of the other for the purpose of the *International Shoe* due process analysis.

*Bridge St. Auto., Inc. v. Green Valley Oil, LLC*, 985 F. Supp. 2d 96, 112 (D. Mass. 2013).

Nor should notice be an issue moving forward. As this Court previously held, "it is clear that Steele and Hansmeier had notice of all filings in this case, including filings that identified Steele and Hansmeier as the controlling owners of Plaintiff."[2] Doc. 43. Now that Steele and Hansmeier have been personally served, in addition to the prior findings of this Court and others regarding sufficiency of notice on the Principals, there can be no doubt any due process concerns have been addressed.[3]

For the reasons that follow, Steele and Hansmeier should be substituted for AF under Rule 25(c) and held fully liable on Chowdhury's counterclaims. "[I]t is not only the transfer of assets in litigation that calls for a Rule 25(c) joinder, but also the possibility that the party to be joined could be held accountable for the actions of the original party." *Maldonado v. Valsyn S.A.*, 434 F. Supp. 2d 90, 92 (D.P.R. 2006). Steele and Hansmeier can be held accountable for AF's actions, and the judgment against AF, because they employed it as an alter-ego, received substantially all of its assets, and secretly controlled all of its litigation. Those issues, adjudicated and affirmed in *Ingenuity 13,* preclude them from denying those grounds for their liability.

## I.      This motion is timely.

This motion is timely. "There is no time limit for a Rule 25(c) motion and the determination is solely within the discretion of the court." *USI Props. Corp. v. M.D. Constr. Co.*, 186 F.R.D. 255, 260 (D.P.R. 1999) (*citing* 7C C.A. Wright, A.R. Miller & M.K. Kane, *Federal Practice and Procedure* 2d § 1959, at 561 (1986)), *vacated on other grounds*, 230 F.3d 489 (1st Cir. 2000). Substitution is appropriate even "after judgment has been rendered." *Negrón-Almeda*, 579 F.3d at 53 (*citing Explosives Corp.*, 817 F.2d at 905). Parties may be added or substituted under Rule 25(c) even after a default judgment. *United States v. Aiken*, 867 F.2d 965, 967 (6th Cir. 1989) (affirming substitution); *Minn. Mining & Mfg. Co.*, 757 F.2d at 1258–59 (affirming addition of "successors in interest and alter egos" of company subject to default judgment).

## II.     Steele and Hansmeier are precluded from denying the grounds for substitution.

Issue preclusion can bind a substitute party to issues previously decided against the party it replaces. *Taylor v. Sturgell,* 553 U.S. 880, 895 (2006) ("a party bound by a judgment may not avoid

---

[2] *See e.g. Exhibit E*, at *7–14; *Exhibit G*, at 704–06, 710; *Exhibit F*, at 720.

[3] *Also, cf. Exhibit E*, at *12 (any due process violation was subsequently cured when Steele and Hansmeier were allowed to brief the issue) *with* Docs. 36 through 39; *Exhibit E*, at *10 (finding similarities in documents filed by the Principals indicate an ongoing relationship) *with* Doc. 37 and Doc. 39; *Exhibit E*, at *7, 10 *with* Doc. 22, at 2 ¶ 7.

its preclusive force by relitigating through a proxy"); *McLaughlin v. Morton,* 1992 U.S. App. LEXIS 23238, *2–3 (1st Cir. 1992); *Rodríguez-Miranda v. Benin,* 829 F.3d 29, 40 (1st Cir. 2016).

"The preclusive effect of a federal-court judgment is determined by federal common law." *Taylor,* 553 U.S. at 891; *see also Vargas-Colón v. Fundación Damas, Inc.,* 864 F.3d 14, 25–26 (1st Cir. 2017) (collecting cases). The party asserting preclusion under federal common law must make a four-part showing: "that '(1) both proceedings involve[] the same issue of law or fact, (2) the parties actually litigated that issue [in the prior proceeding], (3) the prior court decided that issue in a final judgment, and (4) resolution of that issue was essential to judgment on the merits.'" *Robb Evans & Assocs., LLC v. United States,* 850 F.3d 24, 32 (1st Cir. 2017) (*quoting Global Naps, Inc. v. Verizon New England, Inc.*, 603 F.3d 71, 95 (1st Cir. 2010)). However, "the central question is 'whether a party has had a full and fair opportunity for judicial resolution of the same issue.'" *Rodriguez-Garcia v. Miranda-Marin,* 610 F.3d 756, 771 (1st Cir. 2010) (citation omitted).

Applying these "federal preclusion principles," *Monarch Life Ins. Co. v. Ropes & Gray*, 65 F. 3d 973, 978 (1st Cir. 2001), Steele and Hansmeier can and should be made jointly and severally liable with AF; and cannot contend otherwise.

> Issue preclusion bars AF, Steele, and Hansmeier from re-litigating the findings of fact Judge Wright made in *Ingenuity 13* regarding their alter-ego relationship, their conduct, and their business model. …
>
> [The *Navasca* magistrate judge] gave AF the opportunity to be heard and clarify that it was not a shell company created solely to shield Steele and Hansmeier from liability … [but] AF chose not to present any witness at the evidentiary hearing, continuing its campaign of obfuscation.
>
> … Judge Wright's findings (which AF, Steele and Hansmeier are precluded from re-litigating) establish that Steele and Hansmeier are the alter-egos of AF … They share a unity of interest and ownership; they acted as attorneys for AF behind the scenes and dictated all litigation decisions; AF was undercapitalized (indeed, it had no assets as the settlement proceeds never left Steele and Hansmeier's accounts); they kept all litigation proceeds AF "earned"; and AF was a mere shell created to shield Hansmeier and Steele from liability.
>
> … AF is an empty shell created by Steele and Hansmeier.

*Exhibit A,* at *19–23. *See also Montana v. United States*, 440 U.S. 147, 155 (1979) (principals exercised total control over the plaintiff and so "had a sufficient 'laboring oar' in the conduct of the [prior] litigation to actuate principles of estoppel."). The grounds for substituting Steele and Hansmeier as parties—their alter-ego relationship with AF, and their control of its finances and litigation—need not be re-litigated because the same issues were preclusively resolved and affirmed in *Ingenuity 13. Robb Evans & Assocs.*, 850 F.3d at 31.

**A. Steele and Hansmeier's use of AF as an alter-ego was adjudicated in *Ingenuity 13*.**

Steele and Hansmeier's alter-ego relationship with AF and control over its litigation were squarely at issue in *Ingenuity 13*, contested in both the district and appellate courts, and resolving those issues was essential to the sanctions judgment on the merits against them. "The identity of the issues need not be absolute; rather, it is enough that the issues are in substance identical." *Manganella v. Evanston Ins. Co.*, 700 F.3d 585, 591 (1st Cir. 2012) (citation omitted); *Comm'r v. Sunnen*, 333 U.S. 591, 601 (1948). Issue preclusion is applicable even when the causes of action differ. "The relevant question is not the identity of the causes of action in the two cases; it is the identity of the legal or factual issues raised in those cases that matters." *Urological Surgery Prof'l Ass'n v. William Mann Co.*, 764 F. Supp. 2d 311, 320 (D.N.H. 2011) (*citing Keystone Shipping Co. v. N.E. Power Co.*, 109 F.3d 46, 51 (1st Cir. 1997)); *accord Montana*, 440 U.S. at 154–55.

The *Ingenuity 13* court thoroughly explored the deceptive enterprise in which the Principals used AF as a shell plaintiff in litigation they ran behind the scenes. *Exhibit B,* at *7–9; *see also Exhibit A*, at *15, 33. The court found that "the Principals are the *de facto* owners and officers" of AF, which they formed "for the sole purpose of litigating copyright-infringement lawsuits" over which they maintained full control: "The Principals dictated the strategy to employ in each case … and possessed all financial interests in the outcome of each case." *Exhibit B*, at *6–8. *See also Ingenuity 13 LLC v. John Doe*, 2013 U.S. Dist. LEXIS 100849, *8 (C.D. Cal. July 18, 2013) (noting that Principals and AF "continue to act in concert" and "have a history of conspiring together—there is nothing to suggest that they have stopped.").

**B. The Principals' alter-ego relationship with AF was actually litigated in *Ingenuity 13*.**

As required for preclusion to apply, the pertinent issues were actually litigated and determined in detailed findings of fact, "[b]ased on the evidence presented on the papers and through sworn testimony." *Exhibit B*, at *5. The Principals were made parties to the *Ingenuity 13* sanctions proceedings, ordered to appear and show cause why they should not be sanctioned. *Exhibit B*, at *3–5. They argued that they were not subject to personal jurisdiction, but the court found "at least specific jurisdiction over [the Principals] because of their pecuniary interest and active, albeit clandestine participation in these cases." *Ingenuity 13*, Order, ECF No. 86 (C.D. Cal. Mar. 14, 2013). *See also Exhibit B,* at *3.

Steele and Hansmeier had, but chose not to exercise, a full and fair opportunity to procedurally and substantively litigate the issue of their alter-ego liability in *Ingenuity 13*. Therein, the Principals did not attend the first show-cause hearing as ordered; at the second, all three invoked the Fifth Amendment, and the court drew adverse inferences from their refusal to testify. *Exhibit B*, at *5 n. 3. The *Navasca* court noted that "Mr. Steele and Mr. Hansmeier refused to give testimony at the second [OSC] hearing where they could have explained what their relationship with AF was."[4] *Exhibit C*, at *18. That they chose not to does not limit the preclusive effect of the order. "The mere invoking of the Fifth Amendment privilege does *not* disallow issue preclusion in subsequent cases." *In re Tulloch*, 373 B.R. 370, 387 (Bankr. D.N.J. 2007) (emphasis in original) (applying Massachusetts law); *cf. Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 981 (1st Cir. 2001) (where issue was "squarely raised," giving a "'full and fair opportunity for judicial resolution of the issue,' … silence alone satisfied the [actual litigation] criterion under the collateral estoppel analysis") (*quoting Blonder-Tongue Lab., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 328 (1971)). "AF, Steele and Hansmeier all had a full and fair opportunity to litigate these very issues in *Ingenuity 13*. … Any prejudice they might have suffered … was caused by their own gamesmanship and failure to appear at the hearing in violation of Judge Wright's order." *Exhibit A*, at *21; *Exhibit C*, at *24.

**C. The alter-ego findings against Steele and Hansmeier were final judgments on the merits.**

The *Ingenuity 13* order was sufficiently final for issue preclusion to apply. *Faigin v. Kelly*, 184 F.3d 67, 78 (1st Cir. 1999). The precluded issue need not be the ultimate issue decided; "issue preclusion can extend to necessary intermediate findings … even where those findings are not explicit." *Manganella v. Evanston Ins. Co.*, 700 F.3d 585, 591 (1st Cir. 2012) (citations omitted). "'When an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined, the issue is actually litigated.'" Restatement (Second) of Judgments § 27 cmt. d (1982)). A sanctions order may be the basis of issue preclusion in subsequent cases. *See In re Pomeroy*, 353 B.R. 371 (Bankr. D. Mass. 2006); *In re Wasko*, 2013 Bankr. LEXIS 1667 (Bankr. 9th Cir. 2013). Issues decided in a post-judgment order may be preclusive: "it is well established that the finality requirement for collateral estoppel does not require a final judgment." *Pina v. Rodriguez*, 278 F. Supp. 2d 195, 203 (D.P.R. 2003); *accord O'Reilly v. Malon*, 747 F.2d 820, 822–23 (1st Cir. 1984).

It was uncontested that the *Ingenuity 13* order "was a final judgment on the merits" when the

---

[4] The *Navasca* court also made additional findings that evidence had been presented further establishing the alter-ego relationship between Steele, Hansmeier and Prenda. *Exhibit A*, at *9–16.

*Navasca* court found preclusion applied. *Exhibit A,* at *13. Its finality was necessary to the Ninth Circuit's jurisdiction under Rule 54(a) and 28 U.S.C. § 1291. *Exhibit F,* at 718. And it was uncontested when the Principals appealed the *Ingenuity 13* order, which they accurately term a "final order" to support the Ninth Circuit's jurisdiction. *Ingenuity 13, LLC v. John Doe*, No. 13-55859, ECF No. 17-1, at 11 (9th Cir. Nov. 18, 2013) ("*9th Cir. Brief*"). Rather, their opportunity to appeal itself supports a determination that the *Ingenuity 13* order was fully and fairly litigated. *In re Kane*, 254 F. 3d 325, 329 (1st Cir. 2001) (preclusion requires an opportunity to appeal).

**D.  The determinations of AF's alter-ego status were essential to the prior litigation.**

"A determination ranks as necessary or essential only when the final outcome hinges on it." *Bobby v. Bies*, 556 U.S. 825, 835 (2009) (*citing* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4421, at 543 (2d ed. 2002)). For issue preclusion purposes, "a finding is 'necessary' if it was central to the route that led the fact-finder to the judgment reached, even if the result 'could have been achieved by a different, shorter, and more efficient route.'" *Hoult v. Hoult*, 157 F.3d 29, 32 (1st Cir. 1998) (citation omitted).

The *Ingenuity 13* court's findings that AF was a shell company, formed and *de facto* owned and operated by the Principals, resulted from the court ordering them to "show cause why they should not be sanctioned for their behind-the-scenes role in the conduct facially perpetrated by Gibbs." *Exhibit B*, at *3. That control was central to the determination in *Ingenuity 13* that sanctions were appropriate. The court sought to redress not only specific instances of fraud but a systematic reliance on deception whereby the Principals had not "assigned the copyright to themselves, brought suit in their own names, and disclosed that they had the sole financial interest in the suit," but instead, hired other lawyers to file suits in the names of shell companies such as AF. *Id.*, at *12. Findings that the Principals set up the shell companies, "maintained full control over the entire copyright-litigation operation," and "conspired to operate this enterprise," justified imposing those sanctions on Steele and Hansmeier, and not just on AF. *Exhibit B,* at *5–8.

The Principals themselves treat the *Ingenuity 13* findings about their alter-ego relationship with AF as essential, arguing on appeal that the sanctions order should be vacated on the grounds that those findings are erroneous. *9th Cir. Brief*, at 2, 26 (arguing the district court "exceeded its inherent sanctioning authority by imposing sanctions on individuals who had not appeared as parties or counsel in the consolidated cases, were not subject to any existing order of the District Court and were not real parties in interest"). However, the Ninth Circuit affirmed that AF was a shell set up by

the Principals for litigation through Prenda and specifically affirmed the findings that they controlled and bore responsibility for cases litigated in AF's name:

> Based on the myriad of information before it—including depositions and court documents from other cases around the country where the Prenda Principals were found contradicting themselves, evading questioning, and possibly committing identity theft and fraud on the courts—it was not an abuse of discretion for Judge Wright to find that Steele, Hansmeier, and Duffy were principals and the parties actually responsible for the abusive litigation. Similarly, it was not an abuse of discretion for Judge Wright to find that the Prenda Principals were indeed the leaders and decision-makers behind Prenda Law's national trolling scheme.

*Exhibit F,* at 718–19 (footnote omitted). "If … 'the appellate court' affirms both grounds of the holding, each receives preclusive effect." *In re Baylis*, 217 F.3d 66, 70–71 (1st Cir. 2000). *See also Lawton v. Nyman*, 357 F. Supp. 2d 428, 433–34 (D.R.I. 2005).

## IV.     Substitution is also proper against non-parties who control the litigation.

In the alternative, this Court may impose AF's liability on Steele and Hansmeier on the terms set out in *Data General Corp. v. Grumman Data Sys. Corp.*, 886 F. Supp. 927 (D. Mass. 1994). Therein, the court imposed liability for a prior copyright judgment on a non-party who had controlled the defense and had a financial stake in its outcome. *Id.*, at 931–32. The same principles fully apply to the relationship between Steele and Hansmeier and AF.

"It has long been the rule that a nonparty who controls the litigation is bound by the judgment." *Explosives Corp.*, 817 F.2d at 906; *McLaughlin v. Morton,* 1992 U.S. App. LEXIS 23238, *2 (1st Cir. 1992). This principle is true whether or not the action is brought directly in the name of the participating non-party. *Explosives Corp.,* 817 F.2d at 905 (*citing Alman v. Danin,* 810 F.2d 1 (1st Cir. 1986)). Persons for whose benefit and at whose direction a cause of action is litigated cannot be said to be "strangers to the cause. … [One] who prosecutes or defends a suit in the name of another to establish and protect his own right, or who assists in the prosecution or defense of an action in aid of some interest of his own … is as much bound … as he would be if he had been a party to the record." *Montana,* 440 U.S. at 154 (citation omitted). "The result of the judgment is the same, the rationale supporting the judgment is the same, and the actual parties to the judgment are the same, although one party's pseudonyms have now been added." *United States v. Bealey,* 978 F.2d 696, 699 (Fed. Cir. 1992). Such control means "the power—whether exercised or not—to call the shots." *Gonzalez v. Banco Central Corp.*, 27 F.3d 751, 758 (1st Cir. 1994). Non-parties who "assume control over litigation in which they have a direct financial or proprietary interest" are bound by the

judgment. *Alman*, 810 F.2d at 4 (footnote omitted). When assessing whether to substitute and hold liable a non-party to a judgment, the First Circuit instructs that the analysis turns on the relationship between the non-party and the adjudged party, and the role the non-party played in the litigation. *Explosives Corp.,* 817 F.2d at 905; *id.*, at 907.

By that standard, substitution is warranted. "The Principals maintained full control over the entire copyright-litigation operation. The Principals dictated the strategy to employ in each case … and possessed all financial interests in the outcome of each case. … The Principals instructed Gibbs to prosecute these lawsuits only if they remained profitable; and to dismiss them otherwise." *Exhibit B*, at *8–9. The Principals controlled not just AF's litigation but AF in its entirety, as its "*de facto* owners and officers." *Exhibit B,* at *6. Until the *Ingenuity 13* order pulled down the curtain on their scheme, Ruggiero litigated this case in AF's name but on behalf of the Principals, to further and protect their financial interests. Ruggiero considered AF one of Prenda's "subsidiaries," and Gibbs asked him to keep Prenda abreast of this case and his other AF cases by adding Prenda email addresses to the ECF notification list. Doc. 42-2, at 1 ¶ 7. When the Court ordered AF to post a bond, Ruggiero "contacted Steele regarding the Order." *Id.*, at 2 ¶ 11. Gibbs left Prenda in the fallout from *Ingenuity 13*, and Steele and Lutz both instructed Ruggiero to "dismiss all active AF cases," including this case. *Id.,* at 2 ¶ 10. Ruggiero informed Steele that he could not simply dismiss this case as counterclaims were pending. *Id.*; Doc. 22, at 2 ¶ 5. The Court found Steele and Hansmeier had notice of all filings in the case, including filings that identified them as AF's controlling owner, but did not use their "ample opportunity to litigate this case before default was entered." Doc. 43.

"[A]ctual control … should override the artifice of separate legal incorporation." *Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 466 (1st Cir. 1990); *id.*, at 468.

## V.     Alternatively, a finding of alter-ego status under federal common law is appropriate.

This case raised federal questions of copyright law, so federal choice-of-law principles apply, which dictate that federal common law governs the alter-ego inquiry. "If the federal statute in question demands national uniformity, federal common law provides the determinative rules of decision." *Bhd. of Locomotive Eng'rs v. Springfield Terminal*, 210 F.3d 18, 26 (1st Cir. 2000) (*citing United States v. Kimbrell Foods, Inc*., 440 U.S. 715, 728 (1979)). "In federal question cases, courts are wary of allowing the corporate form to stymie legislative policies." *United Elec., Radio and Mach. Workers of Am. v. 163 Pleasant St. Corp*., 960 F.2d 1080, 1091 (1st Cir. 1992). Copyright law

seeks to foster a "national uniformity." *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231 n. 7 (1964); *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1994). Applying state alter-ego law would undermine that uniformity.

Under federal common law, Chowdhury need only show that it would be unfair under the circumstances not to disregard AF's corporate form. "[T]he rule in federal cases is founded only on the broad principle that 'a corporate entity may be disregarded "in the interests of public convenience, fairness and equity.'" *Bhd. of Locomotive Eng'rs*, 210 F.3d at 27 (citation omitted).

Where no statute or statutory precedent dictates "a test for alter-ego liability," the First Circuit has focused on "(1) whether the entities in question have ignored the independence of their separate operations, (2) whether the defendant employed the multiplicity of entities as part of an artifice or scheme to defraud, and (3) whether holding the corporate form inviolate would lead to substantial injustice or inequity." *Intergen N.V. v. Grina*, 344 F.3d 134, 148–49 (1st Cir. 2003) ("borrow[ing] from the standards developed in other statutory contexts that manifest a need for national uniformity"). Subfactors for the first "independent operations" prong include:

> (1) whether a corporation is operated as a separate entity; (2) commingling of funds and other assets; (3) failure to maintain adequate records or minutes; (4) the nature of the corporation's ownership and control; (5) absence of corporate assets and undercapitalization; (6) use of a corporation as a mere shell, instrumentality or conduit of an individual or another corporation; (7) disregard of legal formalities and the failure to maintain an arms-length relationship among related entities; and (8) diversion of the corporation's funds or assets to noncorporate uses.

*Id.*, at 149 (*quoting United States v. Diviner*, 822 F.3d 960, 965 (10th Cir. 1987)).

**1. Any distinction between AF and Steele and Hansmeier is pretext.**

The absence of corporate records supports the contention that AF had no *bona fide* corporate purpose other than to serve as a shell for Steele and Hansmeier. AF had "no official owners or officers" except the Principals. *Exhibit B*, at *6. "No one else appears to work for AF" other than Mark Lutz ("Lutz"), "variously described as the corporate representative and CEO of AF." *Exhibit A*, at *16; *see also* Doc. 42-16, at 10 (identifying Lutz as "Prenda's former paralegal"). Before Lutz, they tried to flesh out AF by alternatively anointing Steele's groundskeeper, Alan Cooper, and his sister's boyfriend, Anthony Saltmarsh, as the CEO without either's knowledge or consent. *Exhibit C*, at *15.

Steele and Hansmeier's Prenda lawsuits were purportedly on behalf of the "clients" but the clients had no financial interest in the proceeds. Prenda's own internal financial documents do not

show any payments to AF. Doc. 42-13; Doc. 42-14. *See also Exhibit B*, at \*7–8. Hansmeier appeared as AF's Rule 30(b)(6) deponent in *Navasca*. *Exhibit A,* at \*26. "Hansmeier was unable to testify about 'the exact mechanisms by which the money goes []' to AF Holdings from the law firms that represent it." *AF Holdings LLC v. Navasca*, 2013 U.S. Dist. LEXIS 118110, \*3–4 (N.D. Cal. 2013). Rather, his testimony was that any settlement funds for AF were directly deposited into Prenda's accounts.

> Q.  You just testified that Alpha Law Firm represents AF Holdings. Has AF Holdings collected any settlement proceeds in the cases where Alpha Law Firm is counsel of record?
>
> …
>
> THE WITNESS: Yes.
>
> Q.  And when AF Holdings collected those settlement proceeds, were they paid directly into the Alpha Law Firm?
>
> A.  No.
>
> Q.  How did Alpha Law Firm receive the money?
>
> A.  The Alpha Law Firm did not receive the money.
>
> Q.  Who received the money?
>
> A.  The proceeds were directed to the Prenda Law trust account.
>
> Q.  So to be clear. When Alpha Law Firm settles AF Holdings cases, the proceeds are paid to the Prenda Law Firm, not to the Alpha Law Firm; is that correct?
>
> A.  They are deposited into the Prenda Law trust account, yeah.

*Ingenuity 13,* Transcript from 30(b)(6) Deposition of AF Holdings, ECF No. 71, at 95:7-25–96:1-3.

In point of fact, AF's pre-suit demand letter instructed Chowdhury to send payment to Prenda at Steele's Miami Beach address. Doc. 12-1, at 2. *See also Lightspeed Media Corp. v. Smith*, 761 F.3d 699, 705–06 (7th Cir. 2014) (see *Exhibit G*) (provided to the First Circuit under Rule 28(j) on July 31, 2014).

All of AF's corporate funds were diverted, primarily to Steele and Hansmeier. The diversion was so extensive that the profit and loss statement showed Prenda operating at a net loss of $450,721.64 for 2012 despite taking in $1,931,977.09 in settlement proceeds, due to $2,382,698.73 in "expenses," including more than $1,343,806.78 distributed to the Principals. Doc. 42-13. *See also* Doc. 42-14; Doc. 42, at 12. "This supports the conclusion that these companies were not independent entities, but rather alter-egos of Steele and Hansmeier." Doc. 42-16, at 13 n. 9. "Steele and Hansmeier were the primary beneficiaries of settlement payments to Prenda Law, giving them a compelling, if secret, financial interest in all aspects of Prenda's operations and litigation. They had a

direct financial incentive to ignore any court order—or ignore Gibbs when he relayed such an order —if complying would slow the flow of settlement proceeds to Prenda." *Id.*, at 14.

When the *Navasca* court "ordered AF to be prepared to explain at the [evidentiary] hearing the money trail and provide an accounting of the funds it received from copyright infringement actions or settlements, AF failed to present a witness who could do so or documents that might shed light on these issues." *Exhibit A*, at *33. AF presented "no evidence … that any settlement or litigation proceeds ever reached AF." *Id.*, at *34.

**18. The Principals employed AF, Prenda and other entities as part of their scheme.**

AF is little but Steele and Hansmeier by another name; a sham entity they created for the sole purpose of perpetrating fraudulent copyright lawsuits. In *Navasca*, AF offered no evidence to rebut evidence establishing "that Steele and/or Hansmeier … uploaded the copyrighted works that form the basis of AF's lawsuits to BitTorrent swarms in order to induce infringement." *Id.*, at *17; *see also Exhibit D,* at *8–9 ("persons affiliated with AF … [uploaded] copyrighted works *in order to induce users to download the works so that they could then be sued for copyright infringement.*") (emphasis in original); Doc. 29, at 3.

In *Lightspeed Media,* subpoenas issued by the defendant revealed the Principals had opened forty-seven bank accounts under the auspices of no fewer than twenty-one different aliases, in a deliberate attempt to obscure the fact that any settlements collected for AF or their other sham entities were then funneled via Prenda into their own pockets.[5] The lack of distinction between the entities can be gleaned from the following transactions outlined in *Exhibit H* through *Exhibit Z.*

**19. Leaving AF's corporate form inviolate leads to substantial injustice for Chowdhury.**

It would be inequitable to allow Steele and Hansmeier to maintain the corporate fiction of AF. Unless they are substituted as parties, the judgment will not be satisfied. It is effectively uncollectible from the non-existent AF, their dissolved firm Prenda, or their fellow Principal Duffy, now deceased. AF did not oppose the Court's order requiring it to post a $60,000 bond for costs, but never complied, though Ruggiero notified Steele of the order. Doc. 20; Doc. 28; Doc. 42-2, ¶ 11. AF never substituted counsel despite notice of Ruggiero's withdrawal. Doc. 22, at 2. Ever since judgment entered against it, Court orders mailed to AF are returned as undeliverable. *See e.g.* Doc. 31. Steele and Hansmeier have proven that *Ingenuity 13* prediction elsewhere by falsely claiming

---

[5] *See e.g. Lightspeed Media Corp. v. Smith*, No. 12-cv-00889, ECF Nos. 135, 172, 189 and 197 (collecting aliases and financial transactions).

inability to pay sanctions. *See Lightspeed Media Corp. v. Smith*, 830 F.3d 500, 508 (7th Cir. 2014) ("Steele and Hansmeier were emptying accounts they controlled of sums vastly in excess of the sanctions they owed"); *Exhibit G,* at 710–12. "AF was a mere shell created to shield Hansmeier and Steele from liability." *Exhibit A*, at *33.

Steele and Hansmeier have been greatly and unfairly enriched by their shares of millions of dollars in shakedown settlements received by Prenda, built on forgeries and falsehoods. Doc. 12, at 16–17 n. 26. They deliberately structured Prenda as a conduit to transfer settlement proceeds to their personal accounts, leaving nothing for injured parties to recover. Leaving the corporate veil intact would go against precedent and let Steele and Hansmeier dodge liability for their roles in the sanctionable frauds they helped perpetrate during the course of these cases. To avoid inequity, their shield must be set aside.

**B.  Even under Massachusetts law, AF's corporate form should be disregarded.**

Likewise, an alter-ego analysis under Massachusetts law instead of federal common law would lead to disregarding corporate form. *See Zimmerman v. Puccio*, 613 F.3d 60, 74 n. 16 (1st Cir. 2010) (applying Massachusetts law); *id.*, at 75 (controlling owners treated "companies as mere shells, ignoring financial, legal and practical formalities in furtherance of their own money-making enterprise"). In Massachusetts, liability may be imposed on an alter-ego theory

> when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.

*My Bread Baking Co. v. Cumberland Farms, Inc.*, 355 Mass. 614, 618–19, 233 N.E.2d 748, 752 (Mass. 1968); *see also Danton v. Innovative Gaming Corp. of Am.*, 246 F. Supp. 2d 64, 72 (D. Me. 2003). Both prongs of the *My Bread* analysis support imposing liability on Steele and Hansmeier. They pervasively controlled AF, as the *Ingenuity 13* court found, and AF's fraud injured Chowdhury, as the entry of default judgment determined. *See* Doc. 29; and Doc. 31. There is a confused commingling of funds between AF, Prenda and other shell companies in a common enterprise, and a deep, purposeful ambiguity about Steele and Hansmeier's actions on behalf of AF: "[T]he Principals' enterprise relies on deception. … The Principals also obfuscate other facts, especially those concerning their operations, relationships, and financial interests. The Principals' web of

disinformation is so vast that the Principals cannot keep track—their explanations of their operations, relationships, and financial interests constantly vary." *Exhibit B*, at \*13; *id.*, at \*9 ¶ 11.

Since *My Bread*, the Massachusetts Supreme Court has identified factors relevant to the analysis, including: common ownership, pervasive control, confused intermingling of business assets, thin capitalization, nonobservance of corporate formalities, absence of corporate records, siphoning away of corporate funds, nonfunctioning of officers and directors, and use of the corporation in promoting fraud. *Att'y Gen. v. M.C.K., Inc.*, 432 Mass. 546, 555 n. 19, 736 N.E. 2d 373, 381 n. 19 (Mass. 2000) (*citing Pepsi-Cola Metro. Bottling Co., Inc. v. Checkers, Inc.*, 754 F.2d 10, 14–16 (1st Cir. 1985)); *see also Zimmerman*, 613 F.3d at 74 (applying certain *M.C.K.* factors, guided by "seminal Massachusetts case" *My Bread*). Those factors also call for holding Steele and Hansmeier liable. They personally and totally controlled AF, using it chiefly if not exclusively as an instrument of fraud. *Exhibit B*, at \*6–9. AF could not have been more thinly capitalized: its only putative assets were its putative copyrights. *Id.*, at \*6. Instead, AF served as a siphon for settlement funds toward Steele and Hansmeier. Prenda's financial statements reflect that almost 70% of the firm's settlement proceeds went to Steele and Hansmeier, while none went to AF. *See e.g.* Doc. 42, at 12–13. AF maintains no corporate records, observes no corporate formalities and has only *de facto* officers or directors. *See Exhibit C*, at \*18–20. Steele and Hansmeier are effectively indistinguishable from AF. Its corporate form should be disregarded so they may bear its liability.

## V. Substitution is proper since Steele and Hansmeier have admitted control of AF and Prenda.

On October 28, 2015*,* the Minnesota Office of Lawyers Professional Responsibility initiated disciplinary proceedings against Hansmeier.[6] Much of the evidence establishing Hansmeier's relationship with AF and Prenda was recited therein. *In re Paul Robert Hansmeier*, No. A5-1885, Petition for Disciplinary Action ¶¶ 1-8 (Minn. Oct. 28, 2015) (see *Exhibit AA*). Hansmeier "unconditionally admit[ted] the allegations of the petition," including his controlling role in AF and Prenda Law, when stipulating to the suspension of his law license. *Id.*, Stipulation for Discipline ¶ 4, (Minn. July 1, 2016) (see *Exhibit BB*); *id.*, Order (Minn. Sept. 12, 2016) (see *Exhibit CC*) (*Exhibits AA–CC* were provided to the First Circuit under Rule 28(j) on July 5, 2016).

> [The Principals] … brought the suits through various law firms in which they had an interest … Steele Hansmeier, [P]LLC; Prenda Law …; and Alpha Law.

---

[6] The Illinois Attorney Registration and Disciplinary Commission filed similar charges against Steele two months prior. *In re John Lawrence Steele*, No. 6292158 (Ill. Aug. 20, 2015) (see *Exhibit DD*).

The "clients" represented by [the Principals] in the various litigations included AF Holdings, Inc. … and others.

… Brett Gibbs testified at a hearing in the matter of *AF Holdings v. Navasca* that he conferred weekly with Hansmeier to discuss AF Holdings cases in which Gibbs was appearing as of counsel to Prenda. Navasca offered into evidence at the August 28 hearing evidence of hundreds of calls between Gibbs, Steele, and Hansmeier … .

*See e.g. Exhibit BB,* at ¶¶ 1-3, 76(d), 76(f)-(i), 118–119.

On December 14, 2016, Steele and Hansmeier were indicted for their roles in fraudulently obtaining settlement agreements. The indictment asserted

Prenda Law Inc. was a law firm nominally owned by an Illinois lawyer named [Duffy], but was in fact substantially controlled and beneficially-owned by defendants HANSMEIER and STEELE. … HANSMEIER and STEELE used Prenda Law to cause copyright infringement lawsuits to be filed and collect settlements on behalf of purported clients.

AF Holdings LLC … [was an entity] that HANSMEIER and STEELE caused to be founded. … HANSMEIER and STEELE were the *de facto* owners of AF Holdings. HANSMEIER and STEELE used AF Holdings … as [a] sham client[] that purportedly owned copyrights to pornographic movies or operated computer systems associated with pornographic movies, but which the defendants in fact owned and controlled themselves.

*U.S. v. Hansmeier et al*, No. 16-cr-00334, ECF No. 1, ¶¶ 9, 13 24 (D.Minn. Dec. 14, 2016) (see *Exhibit EE*).

On March 21, 2017, Steele pleaded guilty to the indictment's counts of conspiracy to commit mail fraud, wire fraud and money laundering. *Id.,* ECF No. 43, at 6–7 (see *Exhibit FF*). See also *id.*, ECF No. 46, at 23:1-21, 24:18-22 (see *Exhibit GG*). Two months later, Steele stipulated to the the loss of his license to practice law, acknowledging that he and Hansmeier created AF to shield themselves from liability by obscuring their own interest in AF, and to give their lawsuits an appearance of legitimacy.[7] *Exhibit HH,* ¶¶ 3, 5.

## CONCLUSION

Wherefore Sandipan Chowdhury requests that the Court substitute or add AF Holdings LLC's alter-egos John Steele and Paul Hansmeier as parties under Rule 25(c) and, upon service hereof, enter judgment against them as proposed in the attached amended judgment.

---

[7] "The lynchpin of Chowdhury's Response is his delusional belief that Duffy, Steele and Hansmeier are AF Holdings' alter-egos." No. 13-2535, *Reply Brief of Appellants Steele, Hansmeier & Duffy,* at 20. *Cf.* "[W]hen a party lies to the court and his adversary intentionally, repeatedly, and about issues that are critical to the truth-finding process, "it can fairly be said that he has forfeited his right to have his claim decided on the merits. This is the essence of a fraud upon the court." *McMunn v Memorial Sloan-Kettering Cancer Ctr*., 191 F.Supp.2d 440, 445 (S.D. N.Y. 2002).

Dated: March 21, 2018                    Respectfully submitted,

                                         /s/ Jason Sweet
                                         Jason E. Sweet (BBO# 668596)
                                         jsweet@boothsweet.com
                                         BOOTH SWEET LLP
                                         32R Essex Street
                                         Cambridge, MA 02139
                                         Tel.: (617) 250-8602
                                         Fax: (617) 250-8883

                                         *Counsel for Sandipan Chowdhury*